Actavis Laboratories, FL, Inc. v. Actavis Laboratories, FL, Inc. Okay, the next argued case is No. 17-2557, Tris Pharma, Inc. v. Actavis Laboratories. Mr. Taylor. Good morning, Your Honor, and may it please the Court. This appeal is about whether Tris' patents, which claim an unprecedented relationship between pharmacokinetic properties and clinical effects, should have been found obvious when the prior art failed to disclose this relationship and, in fact, taught away from it. Of those four separate limitations in the claims, are all of them, or any of them, inherent properties of the formulation? No. Okay, and why do you say that? None of them are inherent properties of the formulation. The formulations, and if you look at the evidence of Actavis' experts, Dr. Morton, he testified that he had to do experimentation to get to the pharmacokinetic properties. There is nothing in the record, and there's certainly no evidence or argument that there was any inherency from any specific formulation or any formulation at all. And I know this argument is alluded to for the first time in this appeal in Actavis' briefs, but there's no inherency argument in this case, and the products of the invention are clearly not inherent. That is a question. They sort of dance around it. They sort of imply inherency, but yet it was hard for me to find an argument below regarding inherency and hard for me to specify what findings might support such a conclusion. There was no argument below on inherency, and there are no findings in our view that would support such a conclusion. We saw those words for the first time alluded to in the appeal brief, Actavis' red brief, and if you look at the brief, there's no inherency argument actually in the paper. So it's a little bit, in our view, a red herring. But let me get back to a little bit of a discussion about the invention and why I think there are a couple of areas where the court clearly erred and have a clean path to reversal. The claims require what we call an early TMAX. An early TMAX, not in isolation, but an early TMAX in a formulation that results in 12-hour efficacy. Now, the prior art didn't disclose that, and in fact, the court below credited Tris' evidence that the prior art actually taught away from that. It taught away from using a formulation that, any formulation that had an early TMAX, and the claims require a TMAX, a time to maximum. Can you explain what is the benefit, the improved utility, in having a TMAX at, say, hour four, compared to hour five or hour six? I didn't quite follow what the patient gets out of that. What the patient gets out of the combination of pharmacokinetic and clinical properties. I'm just talking about the TMAX right now. I understand if you can have a single dose for all day, that has value. If you get a very early onset, that has value. I understand that. What I don't understand at the moment is what extra benefit is there in having a TMAX at hour four versus hour five versus hour six versus hour seven. No pharmacokinetic property like TMAX in isolation provides any individual or specific benefit. The key to pharmacokinetics, as they relate to pharmacodynamics as a clinical property, is how that relationship follows. And what the inventors found in this scenario is that they were able to invent the first liquid product by using a pharmacokinetic profile that was taught away from in the prior art to result in clinical benefits that were special. And those clinical benefits are tied to the unique pharmacokinetics. And that is why we've relied and cited the cyclobenzapine case, because we think that precedent is particularly relevant here. Of course, in that case, there was no known PKPD profile for the formulation, whereas here there were a whole variety of items in the prior art that had certain known profiles, right? That's correct. And that, in fact, is why we think this case is even more compelling than cyclobenzaprine. In this case, what was known was all over the map. So far from there being nothing suggesting a PK profile to get these characteristics, the prior art actually taught away from the specific profile that the inventors came up with. I'm trying to remember this case. Are you saying that the inventors used the PK profile to get to the clinical effects? That's not what I recall the story of the invention being. The story of the invention was mixing IR and ER components to get the good clinical effects and then characterizing the PK profile and discovering, maybe by happenstance, that it had a single peak and that it had an onset, and that's relatively early. Not onset, but at Tmax, that's relatively early. The story of the invention and, you know, our inventor— Am I just remembering something? That's not incorrect, Your Honor, but it's not complete. The story of the invention, to the extent it relates to whether the claims are obvious, includes over three years of work towards getting a pharmacokinetic profile that resulted in the clinical effects. Well, didn't they specifically say they weren't shooting for a single peak? They absolutely were not shooting for a single peak. And that was part of what they said was unexpected, right? Exactly. So explain why the single peak is important. Why did the FDA ultimately require the single peak for purposes of bioequipment? Why the FDA requires it is because it is unique and it works in this liquid formulation. As you probably noticed in our record, the FDA, uniquely for this product, requires the generic companies seeking to copy it to do different and additional pharmacokinetic testing to ensure that they have this profile. That's unique. Now, this is something— Go ahead. Excuse me, Your Honor. This is something that was not presaged by prior art and was surprising. And I want the Court to be aware of something that we think is significant. The Court found, based on the evidence that was presented by Triss, that the prior art taught away from using this early Tmax, early time to maximum concentration, to get a 12-hour efficacy. And two pages later in the Court's opinion, relying on those same prior art products, the Court said, well, those Tmax ranges were known in the prior art. Well, they were known in the prior art for products that didn't meet the clinical benefits, didn't meet the 12-hour efficacy. We think it is clear legal error. Which references are you talking about? It's the references, the Metadate CD. Has an early Tmax but doesn't have 12-hour duration? That's correct. Okay. And the products that have late Tmax, like Focalin, like Concerta, those are the only ones that resulted in 12-hour efficacy. Now, the Court then... Doesn't Skrzynski teach Figure 7, 12-hour duration, and then he discloses a Tmax of something like 5.5 to 7.5, which would overlap with your claimed range of a Tmax? Yeah. Defendants put a lot in Tmax, in Skrzynski, and Skrzynski does not disclose an early Tmax. He doesn't disclose 5.5 to 7.5? It does say 5.5 to 7.5. Doesn't that overlap with your claimed range of Tmax? It does at the very end. Okay. So it overlaps. Two things about that, Your Honor. First, overlap is not anticipation, and it doesn't necessarily render the earlier claim obvious. But what's more important is that, first of all, defendants didn't argue below that this Skrzynski reference had the early Tmax. Well, it's in the record, and I thought you said that there's nothing in the record that teaches something with a 12-hour duration and a Tmax that's in your range. Well, Skrzynski was testified to by Strachan, their expert, and he agreed that it doesn't teach within the range. It does not. And if you look at the Skrzynski disclosure, it says 5.5 to 7.5, but that's for a duration that's less than 12 hours. When it talks about a product that has a 12-hour duration, it says 6 to 7 hours Tmax, and that's right in the Skrzynski reference. It says less than 12 hours, or does it say 11 to 12 hours? It says 11 to 12 hours. Okay. So that's 12 hours, then, if it's 11 to 12 hours. The testimony below by all of the experts, including Dr. Strachan, was that that reference suggests that... When it says 5.5 to 7.5 Tmax with an 11 to 12-hour duration in Skrzynski, it doesn't mean 11 to 12-hour duration? The testimony by all of the experts was that that would have led someone to a Tmax of 6 or above if they wanted to get... So are you saying that Skrzynski disclosed two different things, one Tmax to 5.5 to 7.5 with a shorter duration and one with a longer duration but a different Tmax? Skrzynski discloses that you can use a range from 5.5 to 7.5, and then it says for that range you can get a duration of 11 to 12 hours. It goes on in virtually the next sentence when it's talking about a product that is more germane to this invention, a product that has early onset, one and one-and-a-half hours, and it has 12- to 14-hour efficacy. It says to use 6 to 7-hour Tmax. Assuming we find an overlap in both Tmax and the duration, what else would be missing from Skrzynski? Well, Skrzynski doesn't disclose that the product has early onset as claimed in the patent. Skrzynski, of course, you certainly realize from our brief, is a hypothetical. It's based on no data. It was clearly a prophetic disclosure and patent. It's a patent application never issued as a patent. And it's not clear that it's an accurate solution, right? It's not a solution. It is a solid product. And so Skrzynski, the inventors, could have said anything they want about the properties of their product. They only aspired to a product that had, in our view, a late Tmax, and it didn't even aspire to the early onset as claimed in the invention. So even if you assume that the pharmacokinetics of the solid products disclosed in Skrzynski could be applied to a liquid, and there's nothing in there that says it could be, even if you assume that and you had the formulator attempt to make that Skrzynski pharmacokinetics, and even if you assume that the Skrzynski pharmacokinetics in a liquid product would come to the same clinical activity, it still doesn't lead to the claims. Skrzynski does not disclose the early onset that is claimed. So you have to go through. If you make that assumption, then you leave the arguments which you have to rely on in order to preserve validity. You say even if you assume that this was already known, as I think perhaps we must assume. Well, we don't believe that Skrzynski, and it's in our brief that we think it's clearly erroneous for the court to find that Skrzynski even disclosed a single mean peak. But even accepting that it did and accepting everything in Skrzynski, it doesn't lead to the invention. Even accepting that the pharmacokinetic, pharmacodynamic or clinical relationship in Skrzynski could be applied to a different formulation in a liquid. There's absolutely no testimony to making that key connection. But even if you assumed all of that, Skrzynski doesn't get you to the early onset. Where in the record is the suggestion that someone would modify Skrzynski in a way to get to the early onset that's claimed in the patent? Well, if you look at the pharmacokinetics of what was known in the prior art, it was all over the place. The pharmacokinetics of the products of the invention are unique for any product, but it's the first liquid formulation. There was nothing out there on a liquid long-acting formulation. So to look at hindsight, as we believe the defendants did, to say, well, let's pick the pharmacokinetics, the TMAX, from these two products. Let's choose the 12-hour efficacy from these other products and say, well, it was routine experimentation for someone to put it all together. I think it's the definition of hindsight. And, again, if you look at what the court actually found based on the prior art, it's that it's taught away. Now, how do you find that references in prior art that teach away from the claimed key feature, TMAX and late onset, single mean peak with early activity and 12-hour onset, how do you find that those same references lead to obviousness without clear persuasive evidence tying those particular references to the claimed features? And here the claimed feature is a pharmacokinetic, pharmacodynamic, pharmacokinetic clinical relationship. The only evidence on that relationship was presented by TRIS experts, and that is the evidence that the court relied on to find teaching away. You're not claiming that the PD was not known in the prior art, right? Just the connection between the two. Well, it all depends on what you consider known in the prior art. There's no product in the prior art that had the combination of 45-minute onset of activity and 12-hour efficacy. You can look at all the prior art, whether it's solid, patch, whatever. It was nothing. And, of course, none of these had been applied to a liquid. And, you know, I think it's, you know, to get on the, you know, unexpected results. I mean, it is notable that methylphenidate had been used in Concerta and other products for 50 years. There was an acknowledged need for a long-acting liquid product. If it was so obvious, was so clear from what was known about the pharmacokinetics, why wasn't it done before? And so when you look at the prior art, and I'm over my time. Yes, you are. You've made some interesting points that I will ask your friend. Thank you. We'll save some rebuttal time. Great, thank you. Mr. Jay, I was particularly interested to hear the argument that there's been no product in the prior art that's combined these two kinds of components. Good morning, Your Honor, and thank you for starting me there because I think it's important to begin just there. The idea that there has been no product with a 45-minute onset and a long-acting duration, that's right in the teeth of the findings that the district court made, and I think that as this court considers it, under the clear error standard, those findings are not clearly run into. Which product? Concerta, Your Honor. And once we've finished talking about Concerta, I'd like to also come back to Staszynski, which admittedly is not commercialized, but is certainly in the prior art. Right, I think the claims here, they don't just have two requirements, early onset and 12-hour duration. They all have 12-hour duration and then plus these PK profiles and things like this. So that's the challenge, being able to put together a rationale for why it would have been so obvious with the reasonable expectation of success to have all of these different features as we're citing the claim. Sure, I understand that. I took Judge Newman to be asking the question where my friend had just left off about the idea that there is no product with these actual clinical benefits. But the district court made no finding with respect to the onset for Concerta, and there is a dispute between the parties on that. You say 30 minutes to 2 hours. Your friend on the other side says 2 hours. District court made no finding. I don't agree with that, Your Honor. I would point you to page 47 of the appendix where the district court says the prior art disclosed and Dr. McGuff conceded that the second-generation products have onset of action in as early as 30 minutes. That's the products, not just Kaczynski. And then the citation is to JTX 19 at 2, and that is the Biederman reference that the other side's expert had to say was mistaken. The district court quite properly concluded that when a litigation expert says that a piece of published prior art is mistaken, the court doesn't have to credit the litigation expert. So what are we supposed to do with the fact that you're pointing to the secondary consideration section of this opinion where when we look at the front part of the analysis, it doesn't talk about Biederman. It just talks in broad generalities of how it was known to have something with early onset and long duration without actually scoping down to the specifics of what's claimed, which is 12 hours and 45 minutes. I don't think that that's – I think that the reason that the district court doesn't – makes this finding on page 47 instead of earlier is that it – the court had rejected the idea that a single peak product would teach away from early onset by using Kaczynski, which of course is not a commercial product. So it doesn't start talking about the commercial products until it is talking about the secondary considerations, but it certainly is making a finding based on the very evidence, the very factual and expert dispute that the parties had raised. But how do we deal with the finding of teaching away with this apparently contrary statement? How do we decide what exactly the district court found? I don't think that there's any way to read the district court's decision as my friends read it as a finding of teaching away based on single peak, which is where the discussion is, or on TBACs because the district court, I think, makes a couple of important findings. One, the court on – in discussing Kaczynski specifically says that Kaczynski teaches toward a single peak. That's at page 41. That's not compatible with the notion that two pages before the district court has found teaching away. All the district court said was that it had found some things persuasive about the other side's evidence about the commercial products, the second generation products, but it then goes on to discuss the remainder of the prior art, and in finishing that discussion, it says that Kaczynski teaches toward a single peak. The other side's argument is that the prior art taught away from a single peak. Go ahead. Okay, I guess here's my concern, which is there's this debate isolated down to whether you could achieve a single peak where the real argument needs to be can you achieve a single peak while also having 45-minute onset and 12-hour duration all at the same time. And the counterargument to that is, well, in order to get that very early onset, you need a lot of immediate release components. In order to get the all-day effect, you need those sustained release components. And so when you have a bunch of immediate release components combined with a bunch of extended release components, what are you going to get on your graph? You're actually going to get two peaks. You're not going to get a smooth single peak. And so then the challenge is, well, then how are you really going to expect to get all three of the claimed features, i.e., 45-minute early onset, single peak with 12-hour duration? And that was the concern I had in trying to understand this district court's opinion as to why one would expect all of that when the analysis is that the single peak is really just a single peak question in isolation without considering it in combination with the other two claimed elements. Sure. Now, of course, as Your Honor's questions to my friend have brought out, Sissinsky includes at the very least the durational component as well. But let's talk about the three elements in combination. And this is an extended release product. And one of the most important findings that the district court made and one of the most important things to understand about the extended release product, because it is made of a combination of immediate release and extended release beads, is that what matters for the clinical effect, both the early onset and the duration of action, is not the Tmax. It's the combination. It's the ratio of immediate release beads. But the Tmax is one of the claim limitations. That's correct, Your Honor. We can't ignore a claim limitation. We are not asking you to ignore the claim limitation, but it is stipulated in this case that there's a motivation to make the product with early onset and extended duration stipulated. The findings, I think, show why there's… It seems to me that there was what we've always said is not appropriate, which is you can't just pick and choose and find pieces in the prior art and say, therefore, it's all there. You have to have a motivation to put them all together. You do, Your Honor, but where you have a motivation to combine the prior art, in this case to achieve certain clinical results, early onset and extended duration, which are two of the claim limitations, from there because the evidence shows that, as my friend conceded this morning, the shape of the curve, for example, has no therapeutic significance at all. But the FDA requires that curve, right? It requires a single peak. I don't agree with that, Your Honor. I believe that, and this is more relevant to the infringement issue that the district court did not decide, but I believe the evidence shows that the other side had told the FDA that Quillan has two peaks. But in any event, we think that the number of peaks and the TMAX, in this case, go to what this Court has inquired in cases like PAR versus TWI. Are these suitable options once you have the motivation to combine the prior art? Because the TMAX has no therapeutic significance, for example, or if you've achieved early onset and extended duration, because the number of peaks in the curve has no therapeutic significance. Well, when you say no therapeutic significance, but the claim, it's significant to the claim. It is significant to the claim. So you seem to be dancing around an inherency argument, but you never made an inherency argument below. We did not. I'm making a suitability argument based on cases like PAR, like Bayer versus Watson, for example, in which it doesn't matter whether the combination achieves the – where there are multiple ways of achieving a combination, it doesn't matter whether it is the best option. What matters is whether it is – whether a combination with all the claim limitations is a suitable option unless there is a teaching away. And that is why the question whether there is a teaching away from a single peak is so important. Let me see if I can unpack this a little bit. I take your argument to being that because there's no evidence that a single peak matters versus two peaks or maybe a shoulder and then a single peak, that it would be obvious to have any of those types of PK profiles, and then it's just a matter of selecting one over the other. But there's still at the bottom then has to be a reasonable expectation of success that you could achieve any one of those PK profiles. Now, the patent owner is making an argument that nobody would have expected that you could have been able to achieve a single profile given the requirements of having 12-hour duration and a very early onset. And that is the question that I was looking for an answer to in the district court's opinion, and that's my concern right now. Where would it have been – where is the evidence for why ex ante one would have expected reasonably that you could have achieved a single peak? The evidence is the evidence that was submitted on the question of acute tolerance or tachyphylaxis, which was the emphasis that the other side placed on the PK profile in the district court. The question was whether you would expect to see some falling off based on a single peak profile. In other words, you wouldn't be able to achieve the long-term efficacy over the 12 hours because you'd see some falling off. And the other side's expert admitted when confronted with figure one from Swanson that what matters is not whether there's a single peak but whether there is a flat PK curve. Let me drill down a little bit more. My concern right now is what is the content of the district court's opinion. As I understand right now, unless you can show me otherwise, the district court's opinion doesn't address the acute tolerance theory in the analysis section. And then it seems to just assume that if you can make a single peak, then the 45-minute onset and the 12-hour duration would be unaffected. By just doing a deconvolution or some kind of ratio mix to figure out a way to get a smooth single curve, the 45-minute onset and the 12-hour duration would stick in place and not move. And I'm concerned about why that is so. You might be able to dig through the appendix and show me pieces of testimony that support that kind of conclusion, but I don't see it in the district court's opinion. And that's what I'm afraid of in terms of whether to affirm this based on the lack of addressing acute tolerance and the lack of really explaining why you can get a single peak while still preserving 45 minutes and 12-hour duration. And I think that the reason that you should not have any reservations about affirming that on the acute tolerance point is because on the key point, there's an admission from the other side's expert, which I believe the district court credits, although I don't have the page number right in front of me at the moment where the court does that. But where the admission is is at page 2267 of the appendix, where Dr. McGough, the other side's expert, says that each paper on which he relied stated that the acute tolerance theory is based on a sustained flat plasma concentration. So in other words, basing the teaching away argument on the idea that a single peak would lead to tachyphylaxis, would lead to acute tolerance, would prevent you from accomplishing that efficacy over the course of the 12-hour day, that does not come from the single peak on the curve. It comes from the shape of the curve. Are you saying that we should then look at some things in the record that you want to point to to conclude that the district court was wrong in its teaching away finding? I respectfully don't accept the premise that the court made a teaching away finding and perhaps have to disagree about that. But I'd like to try to convince you that at the bottom of page 39, where the court refers to the second-generation commercial products and says that some of the other side's evidence on that is persuasive, I don't think that the court is thereby making a finding that all of the things it has said to date are the arguments that Trist was making, are hereby accepted by the court and given the status of factual findings. That's not how we read page 39 of the appendix, and we don't think that you can read it that way. Just to give you one example, Trist said teach away, but then at page 46 the court says that these same products show that a single peak product could provide for rapid onset and extended duration. The court can't have accepted Trist's arguments, and we don't think that that's the correct way to read this statement. The district court meant at the bottom of page 39 when it says the court believes Trist's evidence regarding the secondary generation products is persuasive. What pieces – because obviously you're looking to back out some of Trist's evidence and arguments that the district court found persuasive, but obviously it found something that Trist presented as being persuasive. But at a minimum – What pieces, in your view, did the district court find to be persuasive? Well, at most, Your Honor, it's evidence regarding second generation products, and that is not the full extent of the prior art, and the court, you know, in kind of good narrative fashion – But just to help translate for me, what about the second generation products that Trist was arguing did the district court find persuasive in your view? I'm not sure that the court can be said to have credited any particular argument, but it certainly can't have credited any of the arguments. Well, it lists four or five and then says I find those to be persuasive. I don't think that's what the court says, Your Honor, respectfully. The court says, well, the court believes Trist's evidence regarding the second generation products is persuasive. It's not dispositive. And so two things about that. One, the court goes on for the next two paragraphs to discuss the Szczynski reference, which is not a second generation product because it was not commercialized, but which is nonetheless in the prior art, and the court obviously gave considerable weight to Szczynski despite the other side's attempts to discredit it. The court considers that and, you know, weighs the competing expert testimony and makes a factual finding that Szczynski teaches toward, not away from, the single peak at the top of 41. And then, you know, again, all throughout the pages 45 to 46, and I believe on to 47, where the court makes additional findings about the second generation products specifically, the court can't have credited all of Trist's arguments about teaching away and made the same findings that it made about unexpected results and long felt need. Yeah, well, let's... Well, your time is up, but can I ask a question? Unexpected results... I was really troubled by the whole notion it just discredits all of the testimony. And the basis is, you know, that the expert supposedly said he didn't know what the closest prior art was. But the point that the expert was making, as I read it, is that there are four separate limitations, and while the closest prior art on one limitation might be X, it depends on which limitation you're talking about and which factor you're talking about to decide what the closest prior art is. And so instead of saying, okay, well, that might go to the weight of his testimony, he just rejects all of it out of hand. I don't understand how he could do that. Well, but of course, Your Honor, the court then, in the next paragraph, the carryover paragraph from 45 to 46, takes on the argument on its own terms and considers Triss's arguments and concludes that there is not an unexpected result. So, you know, comparing... proceeds to do the comparison after having made this methodological point. The frustration here is the findings are all over the map, and so you want us to pick and choose findings, they want us to pick and choose findings, and yet what we need is a road map that has findings that are clear and lead in one direction. Respectfully, I would submit, Your Honor, that in this case, we've cited a number of findings that go to specific pieces of prior art, that go to specific disputes between experts, all of which the district court resolved in our favor. The other side has cited one finding, and we don't agree that it's a finding, but the one thing that they cite from the district court that they agree with, and in their reply brief, they characterize it as a finding and ask you to defer to it, it's that difficult-to-understand statement at the bottom of 39. We think that, I candidly concede that it is difficult to understand if you look only at that paragraph, but seen in context, reading the next couple of paragraphs and reading all of the actual specific findings on which we've relied, I don't think that you can read the district court to have abruptly credited a large portion of Tris' case in this one kind of half a sentence. So we agree that this court wants benefits from clear and detailed factual findings on these points, but we submit that the key findings in this case, some of them have not even been appealed, such as the findings that a liquid methylphenidate product is obvious. Second... I'm sorry to interrupt you, but before you go, where did the district court talk about why one would have a reasonable expectation of having an early TMAX with a 12-hour duration? I didn't see that in the opinion. It comes from the ratio, Your Honor. So the testimony is at 2164 and 2172. I'm sorry. I want to know what page of the district court's opinion... I would put you first to 41 and then to 43, Your Honor. All right. So 41 was talking about TMAX and half-life. Mm-hmm. And so I just want... Are you suggesting that I should be thinking of half-life as a stand-in for duration? No, Your Honor. They're distinct, but you'll see that the court goes on to discuss the TMAX range and then the half-life range separately. Right, but the argument, as I understand it, from the other side is it was unexpected that you could achieve a 12-hour duration while having an early TMAX, and that was surprising, and that would not be reasonably expected ex ante when you're designing a drug that would... Right. The argument is, among other things, to get a 12-hour duration. Right. So I would point you to the sentence that begins with, lastly. Lastly, Dr. Strawn expected that OPOSA would not have targeted a specific TMAX or half-life because those parameters do not control the onset or duration of effect. And if you look at the two testimony pages that are cited there, so he cites 380 and 377, and that translates into, I believe, 2164, 2172. What our expert, Dr. Strawn, the only PKPD expert to testify on invalidity, what he says on this subject is that for an extended-release product, it's the ratio, the ratio of immediate release to extended-release beads in the product that controls the duration of action, not the TMAX. So the TMAX is incidental. Once you've formulated the product, you can look at what the curve looks like but the curve and the TMAX of that curve are a function of the ratio. The ratio is what the formulators would have drawn from the prior art. The ratio is drawn from the range of, you know, the narrow band identified by the experts from the prior art. That's how you figure out what to use in the context of an extended-release product. The TMAX here has no therapeutic significance. It is incidental, and that's why I would go back to the PAR versus TWI case. A TMAX within this range is a suitable way of achieving the goal, you know, the goal that everyone stipulates there's a motivation to pursue, early onset and extended duration. But do you agree that there has to be a reasonable expectation of being, in addition for purposes of this claim, for obviousness, to also get an early TMAX? Yes, and the court, in that sentence that I've read, I think the court is agreeing with our expert's conclusion that in the context of extended release, it is the ratio and not the TMAX that determines how long the response lasts. I mean, the other side had been arguing that, in general, it's the TMAX that determines it. And what the court says, what our expert says, this is at 2101, is that that may be a rule of thumb for many products, but for extended-release products are an exception to that rule of thumb. If you look at the ratio. Isn't that the problem? That until you do it, you don't know. And if it is this unusual to combine immediate and extended release, how do you know it's going to work until you do it? Well, but respectfully, Your Honor, it's not at all unusual to combine immediate and extended release. That's how each of these prior art second-generation products works. Each of them is an extended release that combines some immediate release and some extended release. And the way that our expert approached this is to look at the ratios from the relevant prior art products and to explain where a formulator would put the ratio using the teachings of that prior art. I mean, there are elements of these claims that go to the ratio between immediate and extended release. But the other side is not arguing that the ratio is itself inventive or that the selection of the ratio is what separates these claims from the prior art and makes them patentable. That's not an argument they're making at all. And once you have determined the ratio based on the teachings of the prior art and the onset and duration that you want to achieve, the TMAX follows from that within a range. Okay. Thank you. Thank you very much, Your Honor. And let's see. We've run over, Mr. Taylor, I think six minutes. Great. Thank you, Your Honor. I want to address first this issue about this ratio. Yes. And, you know, this gets to the kind of fundamental error that I think the Court was led to by the way obviousness was argued below. There is a huge difference between finding a formulation that has a particular set of pharmacokinetic parameters and evidence that a certain set of pharmacokinetic parameters will provide a certain clinical profile. Now, this question of ratios, there was some testimony by activists' formulation expert that you could use a whole host of range of ratios to tailor your product to get certain TMAX values. And he looked at products in the prior art including Concerta and Metadate. Now, if you look at those products, the PK profiles from those products, with almost the same ratios, they look very different. And their properties are very different. So it's not just a matter of ratios that will get you to the claimed invention. What the inventors found was that there was a particular set of pharmacokinetic properties when applied to its liquid formulation that resulted in a unique and beneficial set of clinical properties. That's not in the prior art. And there is no suggestion in the prior art of getting to those claimed pharmacokinetic clinical profiles. It's just not there. And Concerta has something that's close to a single peak, right? It's got a little shoulder there and then it's got the big peak. Yeah, close to a single peak, in our view, is not a single peak. That's fine, but I wouldn't go so far as I think you did to say it's completely different. Concerta... The district court found it's very close and because it's so close, it would be actually pretty routine to optimize if you wanted to, to have a single peak. That's what I understand the district court... Yeah, and it's, again, one of the errors that the court, I believe, was also led to. Concerta doesn't have the Tmax that is claimed. It wasn't even argued to have the claimed Tmax. So even if you accept that Concerta is a product that has a single mean peak, it has a late Tmax, which is what the prior art would have expected. You want to get a late, long activity... What's your response to the argument that the Tmax isn't really important to the clinical value? Well, I would agree with you, Your Honor, that you don't read claim limitations that you have a problem meeting by an argument that they're not important. They are important to this invention and that's why I made the point of citing to the FDA change in its procedures to have a three characteristic pharmacokinetic disclosure that ensures that the generic products who copy this product have the same profile. And with this product, the Tmax is important. Now, Tmax by itself, sure, there are ways that formulators can get to a Tmax, but what do we know about from the prior art about Tmax? The later the Tmax, generally the longer the activity. It's what was expected and what was shown by the prior art. Well, that's a contested fact below, right? That's obviously your argument, but the other side's argument is that there wasn't really a proven connection between Tmax and duration. Actually, that's not contested. Every expert agreed that generally later Tmax results in later efficacy. There is a disagreement as to this whether, you know, someone would go to a single mean peak and whether the prior art would have taught away from going to a single peak, but there's no... Dr. Strawn didn't say Tmax has no effect on duration? I believe what Dr. Strawn said is that a formulator, a scientist wouldn't focus on the Tmax. Tmax absolutely does... Because it doesn't have an impact on duration. Well, I don't believe that Dr. Strawn said that and that would, of course, is at odds with what the court found. Do you agree with your friend on the other side that there was no dispute but that Concerta had the early onset? There's absolutely a dispute about whether Concerta had an early onset. Concerta, if you look at the clinical data for Concerta that's in their package insert, it says that the onset is at two hours. Now, there is this one reference that says, you know, look for it from 30 minutes to two hours, but the actual data that's in the package insert for Concerta says the onset is two hours. But let's assume that it's 30 minutes to two hours. That's not the same as the claimed limitation of less than 45 hours, 45 minutes. It's not the same. Why is 30 minutes not the same thing as less than 45 minutes? No, well, 30 minutes, if it was, if the reference said activity within 30 minutes, yeah, I would agree with that. It says 30 minutes to two hours. The claim requires activity within 45 minutes. That's not the same thing and there was nobody that testified that said it was. I thought Dr. Beardman did. No, he said that it was 30. That was a reference with Beardman and that was the reference that our experts said was clearly mistaken. The reference says, you know, in a table for Concerta without any data, without any reliance on anything else, 30 minutes to two hours. The district court pointed to Beardman at 8.47, right? Excuse me? The district court pointed to Beardman at 8.47, right? I'm not sure that it did. I don't think it did. In the unexpected results discussion? 8.4 district court? I don't think so, Your Honor. To my memory, there's no finding in the court's opinion except in what you cited, too, in the... Oh, I'm sorry. It's that Dr. McGough conceded that the second generation products have onset action in as early as 30 minutes. That's what the district court pointed to at 8.47. Yeah, but second generation products, Your Honor, include products that have long effect and products that don't have long effect. There are second generation products that only have six to eight hour effect. So then would the logical extension of Dr. McGough's testimony be that a subset of those second generation products have long duration effect and early onset of 30 minutes while another subset would have a less than long duration but still have 30 minute onset? Yeah, I think, again, there are second generation products like Metadate CD who have an early Tmax that don't have more than six or eight hours effect. There are other products that have a late Tmax like Focalin and Concerta who don't have the early onset and have 12 hour efficacy. That's the exact evidence that the court relied on to show teaching away on this very characteristics. So to cite to some general testimony that says, well, second generation products have a range of early onset, well, that in isolation means nothing unless you're looking at what these products actually disclose. And that's one of the areas... Before you sit down, has there been a launch? Excuse me? Has there been a launch? A generic launch? Mm-hmm. No, there has not. Well, there was FDA approval, right? I'm not sure. I don't think they do have final approval yet, Your Honor. Any more questions? Any more questions? Okay, we will take the case under submission. Thank you both. Thank you.